IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| ANGELA K. O'CONNOR, | * | |
| Plaintiff, | * | |
| vs. | * | CASE NO. 3:06-CV-092 (CDL) |
| CHRIS HOUSTON, individually and as Sheriff of Greene County, Georgia; and the GREENE COUNTY SHERIFF'S OFFICE, | * * * | |
| Defendants. | * | |

O R D E R

Plaintiff Angela K. O'Connor, a former deputy of the Greene County Sheriff's Office ("GCSO"), asserts a claim for retaliatory termination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* Presently pending before the Court is Defendants' Motion for Summary Judgment (Doc. 15). For the following reasons, this motion is granted in part and denied in part.[1]

FACTUAL BACKGROUND

Viewing the facts in the light most favorable to Plaintiff, the record supports the following:

---

[1] Plaintiff acknowledges (1) "that the 'Greene County Sheriff's Office' is not a legally separate entity from the sheriff himself" and (2) "that the action is against [Sheriff Houston] in his *official* capacity and not his individual capacity." (Pl.'s Opp'n to Defs.' Mot. for Summ. J. 10 [hereinafter Pl.'s Opp'n Mem.] (emphasis added).) Accordingly, the Court grants Defendants' Motion for Summary Judgment (Doc. 15) with respect to Defendant Greene County Sheriff's Office and Defendant Chris Houston in his individual capacity.

1

Defendant Chris Houston has served as Sheriff of Greene County, Georgia since 1997. In 2004, upon the recommendation of Chief Deputy Kevin Roberts, Defendant Houston hired Plaintiff as a patrol deputy. At the time of her hiring, Plaintiff was one of only three female deputies employed by the GCSO.[2] Plaintiff contends that throughout her employment with the GCSO, "[she] was subjected to events that gave her reason to be concerned about possible sex discrimination." (Pl.'s Opp'n Mem. 2.)

According to Plaintiff, she "was being discriminated against pretty much from day one." (Pl.'s Dep. 130:22-23, July 18, 2007.) Plaintiff claims that her male coworkers repeatedly informed her that: (1) "the Chief Deputy had not wanted to hire her" because she is female; (2) "the Chief Deputy considered her a liability" because she is female; (3) "the Chief Deputy considered it necessary to send 'males' to back her up"; (4) "she was not to be assigned to normal duties (like the interstate [patrol])" because she is female; and (5) "if she ever dared to claim she was a victim of discrimination, the Chief Deputy would 'find a reason to fire' her." (Pl.'s Opp'n Mem. 4; *accord* Pl.'s Dep. 81:3-5 & 24-25, 82:1 & 13-17, 83:10 & 15-21, 95:23-96:6, 97:3-8 & 16-22, 98:23-99:25.)

---

[2]Plaintiff was the only female deputy assigned to active patrol duty. Deputy Paula Brook "manages [the Greene County] sex offender registry," "serves as [Chief Deputy Roberts's] secretary," and "[p]eriodically" fills in on patrol. (Roberts Dep. 9:18-19, 21-25, July 18, 2007.) Corporal Doris Brookins is "the supervisor of the schools' resource offices." (*Id.* at 11:4-6.)

**I.    The Kilgo Incident**

On January 19, 2006, Plaintiff responded to a dispatch request for a "high risk" suicide situation.[3] Plaintiff had responded to calls at this residence on three prior occasions, and she was the first officer to enter the house. According to Corporal Jason Manley, the supervising officer on the scene, Plaintiff entered the residence despite his direct order that she "stop and come back to [his] location." (Reprimand 1.) Immediately after giving this order, Corporal Manley observed Plaintiff "stop[] and look[] at [him] and then proceed[] on into the residence." (*Id.*) Once Plaintiff continued into the residence, the other officers "had no choice but to proceed with [Plaintiff] . . . and give up [their] position." (*Id.*) Corporal Manley believed that Plaintiff intentionally disregarded his order, "put[ting] not only [herself] at risk, but all others with [her] as well." (*Id.*) Plaintiff claims that she simply did not hear Corporal Manley's order to stop.[4] (Pl.'s Dep. 27:5-7.)

Upon entering the home, Plaintiff observed the owner, Mr. Kilgo, "on the telephone" with "[h]is other hand . . . holding a pipe." (Pl.'s Dep. 19:15-17.) She asked Mr. Kilgo to "keep his hand

---

[3]The call came from a residential health care nurse in reference to her patient, who "[had] a history of threats to take his life and [was] a cancer patient and alcoholic." (Ex. D to Defs.' Mot. for Summ. J. 1 [hereinafter Reprimand].) When the nurse advised that "Mr. Kilgo was in possession of numerous guns[,]" the call was "elevated to that of a high risk call, due to the nature of the threat and the means to carry that threat out." (*Id.*)

[4]Other officers standing near Corporal Manley also stated that they did not hear him order Plaintiff to stop. (*See* Roberts Dep. 56:7-11.)

3

visible" and she "told [Mr. Kilgo] who [she] was, reminded him that [they'd] met before." (*Id.* at 19:19-22.) According to Plaintiff, her "primary objective was just keeping [Mr. Kilgo] occupied, making eye contact and keeping his hands in [a] position . . . so I could maintain our safety." (*Id.* at 20:1-4.) Although Plaintiff did not draw her gun from its holster, "[t]he safety snaps were undone." (*Id.* at 20:25.) The officers ultimately secured the scene without incident; however, one of Plaintiff's colleagues "found a loaded 357 revolver located next to Mr. Kilgo's person" and "Mr. Kilgo's blood alcohol level . . . registered at .236." (Reprimand 1.)

## II. Plaintiff's Reprimand

On the afternoon of January 19, Corporal Manley spoke with Chief Deputy Roberts about Plaintiff's behavior at the Kilgo residence. Chief Deputy Roberts decided to discipline Plaintiff "for being unsafe, . . . address[ing] the fact[s] that no other deputy that arrived prior to [Plaintiff] had entered . . . [and Plaintiff] entered without a weapon drawn." (Roberts Dep. 59:2-5.) He contacted Defendant Houston, asking if he would "convene a review board, a board of [Plaintiff's] peers" so that "maybe she'[d] accept [discipline] in a positive way." (*Id.* at 59:25-60:2.) Plaintiff received a written reprimand for insubordination and failure to comply with orders, and she was suspended, with pay, pending the review board investigation. (*See* Reprimand; Roberts Dep. 66:5-11, 67:13-15.)

4

The disciplinary review board convened on January 27, 2006 "to determine whether or not [Plaintiff]'s behavior in the line of duty was indeed unsafe." (Roberts Dep. 61:2-4.) The board interviewed all the officers who were present during the Kilgo incident, and ultimately found that it "could not determine that [Plaintiff] heard the order given by Corporal Jason Manley." (Ex. E to Defs.' Mot. for Summ. J. 1.) Nevertheless, "based on the testimony . . . and [Plaintiff's] past performance history," the board recommended three days suspension without pay, 90 days working in the jail, six months probation, and officer safety training. (*Id.* at 2.)

Plaintiff believed that "if this had happened to one of the other deputies, . . . it would [not] have gone as far." (Pl.'s Dep. 133:21-23.) Plaintiff also believed that "it wasn't fair for [her] to be punished." (*Id.* at 70:22-23.) Her supervisor, Sergeant Rocky Land, "was confused with how [the disciplinary review] was handled" and advised Plaintiff that "[she] really need[ed] to talk to [Defendant Houston]." (Pl.'s Dep. 47:10-12.) On the afternoon of January 27, Plaintiff called Defendant Houston and asked if they could meet to discuss the hearing. Defendant Houston told Plaintiff that he wanted the situation handled that day, and asked Plaintiff to "[c]ome on over to [his] house."[5] (*Id.* at 52:19.) Defendant Houston also informed Plaintiff that he planned to alter the

---

[5] Defendant Houston claims that Plaintiff demanded that she meet with him that evening and asked if they could meet at his house. (Houston Dep. 32:8-15.)

5

recommended discipline by: (1) changing the six-month probation to a year; (2) changing the jail detail to trash detail; (3) adding a Last Chance Agreement; and (4) changing the three-day suspension to one with pay. (*Id.* at 62:2-6.)

When Plaintiff arrived at Defendant Houston's home on January 27, "[they] discussed in detail about [Plaintiff's] feelings that [she] was being discriminated against." (Pl.'s Dep. 72:23-24.) Plaintiff specifically explained that she "felt that the way things [were] being handled with the review board, it was handled unfairly." (*Id.* at 73:9-11.) Plaintiff also informed Defendant Houston that "[she] was attempting to get a phone number for a lawyer in case [she] had some legal questions, in case [she] had some concerns because [she] did feel like [her] rights were being violated." (*Id.* at 73:8-9 & 20-23.) Although Plaintiff characterized her visit as "very relaxed, very comfortable, very easy[,]" (*id.* at 79:7-8), Defendant Houston claims that Plaintiff "basically was refusing to accept the discipline" and "threatened to hold [him] hostage" by saying she was going to sue. (Houston Dep. 33:15-18, 37:12 & 14.)

### III. Plaintiff's Termination

Immediately after his meeting with Plaintiff, Defendant Houston called Chief Deputy Roberts and told him to terminate Plaintiff's employment. (Roberts Dep. 83:4-16.) According to Chief Deputy Roberts, Defendant Houston "didn't appreciate [Plaintiff] coming to his house" and stated "that he wasn't going to be held hostage by an

employee[,] wasn't going to be threatened in order to influence his decision." (*Id.* at 83:21-22, 84:18-20.) He instructed that Chief Deputy Roberts terminate Plaintiff for her "refusal to accept [discipline] and then her attempt to hold [him] hostage by saying she was going to sue[.]" (Houston Dep. 51:24-52:1; *accord* Roberts Dep. 81:1-84:23.)

The following Monday, on January 30, 2006, Chief Deputy Roberts met with Plaintiff and terminated her employment. Plaintiff's letter of termination reads:

> Effective January 30, 2006 your employment with the Greene County Sheriff's Office is terminated. On Friday January 27th 2006 you appeared before a Disciplinary Review Board convened by Sheriff Houston for the purpose of determining the validity of your charges as well as actions to be taken. On Friday afternoon you arrived at Sheriff Houston's residence and basically implied that you were considering taking legal actions against the Sheriff's Office if the recommendations of the review board were not reconsidered. This conduct is totally unacceptable and will never be tolerated.

(Ex. A to Compl. & Ex. F to Defs.' Mot. for Summ. J [hereinafter Termination Letter].)

Based on the language of the Termination Letter, Plaintiff believes "that they terminated [her] . . . because they thought [she] was going to take legal action for stating [that she] was being discriminated against." (Pl.'s Dep. 143:6-8.) She filed the present action on November 9, 2006, claiming that Defendant Houston terminated her employment in violation of the anti-retaliation provision of Title VII. Defendants now seek summary judgment,

7

arguing that the record does not contain sufficient evidence to support Plaintiff's claim.

DISCUSSION

**I.    Summary Judgment Standard**

Summary judgment may be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Where the defendant moves for summary judgment, it is the defendant's burden to show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet this burden, the defendant may point the court to "affirmative evidence demonstrating that [the plaintiff] will be unable to prove [her] case at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (internal quotation marks and citations omitted). In the alternative, the defendant may show "that there is an absence of evidence to support [the plaintiff's] case." *Celotex Corp.*, 477 U.S. at 325. A defendant is not required to come forth with evidence negating the plaintiff's claim. *See id.*

Once a defendant meets its burden, the plaintiff must produce evidence to show that there *is* a genuine issue of material fact. *See Id*. at 324. The plaintiff "must go beyond the pleadings," *id.,* and point the court to "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *accord Celotex*, 477 U.S. at 324. A

plaintiff is not required to produce evidence in a form that would be admissible at trial, but they must point to some evidence to show a genuine issue of material fact. *Celotex*, 477 U.S. at 324. Such evidence may be in the form of affidavits, depositions, answers to interrogatories, or admissions on file. *Id.; accord* Fed. R. Civ. P. 56(e).

The defendant is entitled to summary judgment if, after construing the evidence in the light most favorable to the plaintiff and drawing all justifiable inferences in her favor, no genuine issues of material fact remain to be tried. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. A fact is *material* if it is relevant or necessary to the outcome of the suit. *Anderson*, 477 U.S. at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the plaintiff—there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248.

**II.  Title VII Retaliation**

Plaintiff's sole claim is that Defendant Houston terminated her employment in retaliation for "assert[ing] her right to be free of discrimination and to assert her legal rights under Title VII."

9

(Compl. ¶ 4.)  In order to survive summary judgment on a Title VII retaliation claim, the plaintiff "must demonstrate that there is a genuine issue of material fact as to whether [her] employer acted with . . . retaliatory intent in [her] termination."  *Mathis v. Leggett & Platt*, No. 07-11454, 2008 WL 124512, at *2 (11th Cir. Jan. 15, 2008) (citing *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-81 (11th Cir. 1989)).  A plaintiff may establish a claim of unlawful retaliation using either direct or circumstantial evidence.  *Wright v. Southland Corp.*, 187 F.3d 1287, 1292-93 (11th Cir. 1999). Plaintiff here attempts to establish her retaliation claim using both direct and circumstantial evidence.

    A.    <u>Direct Evidence</u>

Direct evidence is "that [which] reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'"  *Van Voorhis v. Hillsborough County Bd. of County Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (per curiam) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)).  Such evidence "is composed of 'only the most blatant remarks, whose intent could be nothing other than to discriminate.'"  *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).  In other words, direct evidence is "'[e]vidence, which if believed, proves existence of fact in issue without inference or presumption.'"  *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6

10

(11th Cir. 1987) (quoting Black's Law Dictionary 413 (5th ed. 1979)) (alteration in original) (emphasis omitted). A statement that merely "suggests, but does not prove, a discriminatory motive, . . . is circumstantial evidence." *Wilson*, 376 F.3d at 1085.

Plaintiff claims that her termination letter constitutes direct evidence of retaliation because of the clear statement that she was fired for "basically impl[ying] that [she] was considering taking legal actions against the Sheriff's Office." (Termination Letter.) Despite the presence of this language, however, the termination letter is not direct evidence of unlawful retaliation because it requires an inferential leap to establish that Plaintiff's comments are protected under Title VII. Title VII only prohibits retaliation against an employee's opposition to "an unlawful employment practice" or participation "in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). Plaintiff here claims that Defendant Houston terminated her employment because she opposed unlawful gender discrimination, but this is not clear from the face of her termination letter. The letter simply states that Plaintiff was discharged for "impl[ying] that [she was] considering taking legal actions," not that she considered taking such action because of her employer's unlawful employment practice. In other words, Plaintiff's termination letter does not directly prove that she was terminated for opposing "an unlawful employment practice"—i.e.,

engaging in protected activity—and thus it is not direct evidence that Defendant Houston violated Title VII.

    B.   <u>Circumstantial Evidence</u>

Since Plaintiff failed to produce direct evidence of Title VII retaliation, she must proceed on her claim using circumstantial evidence. Under the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Plaintiff must begin by establishing a prima facie case of retaliation. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). If Plaintiff establishes her prima facie case, Defendant Houston has the burden of articulating a legitimate, nonretaliatory reason for the challenged action. *Id.* Plaintiff can then defeat summary judgment by creating a question of fact as to whether Defendant Houston's reason is mere pretext for retaliation. *Id.*

    *1.   Prima Facie Case*

In order to establish a prima facie case of retaliation, Plaintiff must show (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse employment action, and (3) that the adverse employment action is causally related to the protected activity. *Cooper v. S. Co.*, 390 F.3d 695, 740 (11th Cir. 2004) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)). Plaintiff's termination clearly constitutes an adverse employment action. Furthermore, sufficient evidence exists from which a reasonable fact finder could conclude that Defendant

Houston terminated Plaintiff for her comments about consulting an attorney. The only remaining issues regarding Plaintiff's prima facie case are whether Plaintiff's remarks constituted protected opposition activity under Title VII and whether there is a causal connection between those protected remarks and her termination.

### i. STATUTORILY PROTECTED ACTIVITY

In order for Plaintiff to show that her statements or complaints constitute statutorily protected activity, she "must prove both (1) a subjective, good-faith belief that [her employer] engaged in an unlawful employment practice and (2) that her belief was objectively reasonable." *Tatt v. Atlanta Gas Light Co.*, 138 F. App'x 145, 147 (11th Cir. 2005) (citing *Little v. United States Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). Put differently, an employee's statements constitute "protected activity" only if they reflect a subjectively genuine and objectively reasonable belief that the employer engaged in discrimination, harassment, or retaliation "because of . . . race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2, 2000e-3.

Here, Defendant Houston does not challenge Plaintiff's subjective belief of discrimination. Instead, he argues that her complaints of gender discrimination and her statement about consulting an attorney are not protected expressions because it was not objectively reasonable for Plaintiff to believe that the complained-of conduct constituted an unlawful employment practice.

13

Defendant Houston specifically claims that "[n]o 'objectively' reasonable person could believe that the statements attributed by Plaintiff[] to her colleagues constituted discrimination under Title VII." (Defs.' Br. in Supp. of Their Mot. for Summ. J. 6 [hereinafter Defs.' Br.].)

It is well established that a plaintiff "need only show that [s]he had a 'reasonable belief' that an unlawful employment practice was occurring, and is not required to show that the employer actually engaged in an unlawful employment practice." *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 702 (11th Cir. 1998). A plaintiff's belief "must also be measured against substantive law at the time of the offense." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir. 2001). Here, Plaintiff was the only female sheriff's deputy employed by the GCSO who was assigned to active duty patrol. Plaintiff claims that she was regularly subjected to disparate treatment based upon her gender, including the following: (1) one of the supervising deputies asked Lee Stancill, a male patrol deputy, to "remain in [Plaintiff's] area, [her] vicinity" to "protect [her] because [she is] female"; (2) male deputies told Plaintiff she "really need[ed] to go somewhere else" because Chief Deputy Roberts would "never . . . promote[] . . . [Plaintiff] because [she's] a female"; and (3) male deputies also told Plaintiff that Chief Deputy Roberts "doesn't like females" and "didn't want to hire [Plaintiff] to begin with because [she is]

14

female and . . . had only done so because he assumed [she] wouldn't make it through the academy or [she] wouldn't make it as a deputy and it would justify see this is why we shouldn't have females here." (Pl.'s Dep. 81:3-5 & 24-25, 82:1 & 13-17, 83:10 & 15-21; *see also* 95:23-96:6, 97:3-8 & 16-22, 98:23-99:25.) In addition, Plaintiff testified that she heard Chief Deputy Roberts tell all the patrol deputies that "if any of [them] ever try to say we're discriminating against you, I'll find a reason to fire you." (*Id.* at 117:14-15.) Finally, Defendant Houston admits that Plaintiff informed him of at least some of these incidents during their meeting on January 27.[6] (*See* Houston Dep. 33:6-10.) Plaintiff has produced sufficient evidence from which a reasonable fact finder could conclude that it was objectively reasonable for her to believe that her supervisors were treating her differently than her fellow male deputies. Accordingly, she has established the statutorily protected activity element of her prima facie case.[7]

---

[6]Plaintiff recalls that, at a minimum, she informed Defendant Houston about the comments relating to her inability to be promoted because she is female and about Lee Stancill's order to remain in close proximity to Plaintiff because she is female. (Pl.'s Dep. 89:9-11 & 21-23.) Plaintiff also testified that she informed Defendant Houston of her belief that she had been disciplined more harshly for the Kilgo incident because she is female. (*See id.* at 89:20-90:8, 130:13-16.)

[7]The Court rejects Defendants' contention that the manner in which Plaintiff chose to engage in "otherwise protected" opposition activity was "so disruptive or inappropriate as to fall outside [Title VII]'s protection." *Rollins v. Fla. Dep't of Law Enforcement*, 868 F.2d 397, 401 (per curiam) (11th Cir. 1989).

### ii. CAUSAL CONNECTION

The Court also finds that Plaintiff has satisfied the final element of her prima facie case of retaliation, that a causal connection exists between the protected activity and her termination. Plaintiff communicated her concerns to Defendant Houston on Friday, January 27 and she was terminated on Monday, January 30. The three day gap between Plaintiff's protected expression and the adverse action is evidence tending to show that "the two were not wholly unrelated." *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 717 (11th Cir. 2002) (internal quotation marks and citation omitted). Moreover, the language of Plaintiff's Termination Letter, standing alone, is evidence supporting the causal link between her protected expression and her termination. Plaintiff has clearly carried her burden of establishing the causation element of her prima facie case.

Having presented sufficient evidence to support a prima facie case of retaliatory termination, Plaintiff has satisfied her initial burden of establishing a presumption that Defendant Houston terminated her employment in retaliation for her complaints about perceived gender discrimination. The burden now shifts to Defendant Houston to rebut this presumption by articulating a legitimate, nonretaliatory reason for Plaintiff's termination.

### 2. *Legitimate, Nonretaliatory Reason and Pretext*

Defendant Houston admits that he discharged Plaintiff because of her statements related to consulting an attorney.[8] Nevertheless, he claims that his decision was both legitimate and nonretaliatory because he believed that Plaintiff's statements represented a "willful[] refus[al] to accept discipline and directions" and an "attempt to hold [Defendant Houston] hostage by saying she was going to sue[.]" (Houston Dep. 36:21-23, 51:24-52:1.) Defendant Houston also admits, however, that Plaintiff told him that "she felt like she was being discriminated against" and referenced consulting an attorney. (*Id*. at 33:8-9; *see also* 33:17-21, 51:25-52:1.) Thus, it is undisputed that Defendant Houston "was actually aware of [Plaintiff's] protected expression at the time [he] took adverse employment action." *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999) (per curiam) (internal quotation marks and citation omitted). Apparently, Defendant Houston claims that his decision to terminate Plaintiff based upon her refusal to accept discipline and her threat of litigation is wholly unrelated to her protected activity—i.e., her complaints of gender discrimination. Although Defendant Houston's burden at this stage is a light one, one of

---

[8]Defendant Houston testified that he did not approve the language in Plaintiff's termination letter and that this letter "could have been articulated a little better to show that it was [Plaintiff's] refusal to accept, you know, the discipline rather than just the fact that she chose to or would choose to seek legal redress." (Houston Dep. 50:7-11.) He also explicitly states, however, that he would not "have terminated [Plaintiff] if she had never said anything about seeking legal redress[.]" (*Id.* at 50:12-14.)

17

production and not proof, the Court has serious doubts as to whether he has even carried that burden. *Perryman v. Johnson Prods.*, 698 F.2d 1138, 1142 (11th Cir. 1983). By his own admission, Defendant Houston terminated Plaintiff's employment because she made statements about consulting an attorney regarding gender discrimination. Arguably, that alone precludes summary judgment.

Even assuming, however, that Defendant Houston has carried his exceedingly light burden, the Court finds that sufficient evidence exists from which a reasonable fact finder could conclude that the stated reasons for Plaintiff's termination were pretext for retaliation. While it may be true that Plaintiff resisted the proposed discipline and that she threatened legal action, the record contains evidence that Plaintiff engaged in this behavior based upon an objectively reasonable belief that she was being subjected to unlawful gender discrimination. Furthermore, since Defendant Houston clearly had knowledge of Plaintiff's discrimination complaints, a reasonable jury could choose not to give credence to his claim that the decision to terminate Plaintiff had nothing to do with her

protected activity.[9]  For these reasons, Defendant Houston, in his official capacity, is not entitled to summary judgment.

## CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. 15) is granted as to Defendant Greene County Sheriff's Office and as to Defendant Chris Houston in his individual capacity. The motion is denied, however, as to Defendant Houston in his official capacity.

IT IS SO ORDERED, this 24th day of March, 2008.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE

---

[9] Plaintiff and Defendant Houston provide directly conflicting versions of the conversation that ultimately resulted in Plaintiff's termination. First, although Defendant Houston claims that Plaintiff "asked if she could come to [his] house" to discuss the results of the disciplinary panel, (Houston Dep. 32:11-12), Plaintiff claims that she "asked could we meet at the office perhaps maybe on Monday," but that Defendant Houston "proposed that [she] and he meet at his house that evening[.]" (Pl.'s Dep. 53:2-5.) Similarly, Defendant Houston claims that during their meeting, Plaintiff "was really adamant that she wanted to get back into her position," "didn't feel like she should be punished or accept . . . discipline," and "appeared to become angry and basically threatened that she would sue if [he] stuck with [the panel's] decision." (Houston Dep. 32:22-25, 33:16-18.) Plaintiff, on the other hand, describes the situation as follows:

> The conversation was very relaxed.  I was crying a little. Voices were never raised.  The conversation remained very professional, very respectful.  I actually recall his cat because I was sitting on the couch and his cat was climbing around in my lap while I was petting the cat for the entire meeting - - the entire visit.  I don't even want to call it a meeting.  The entire visit was very relaxed, very comfortable, very easy.  You know, just one person talking to another.

(Pl.'s Dep. 78:25-79:9.) In the face of such conflicting accounts of what Plaintiff said, and in what manner, a jury must determine whether Defendant Houston terminated Plaintiff for an unlawful reason.